**Doc FRANCIS' EXECUTOR (Potter Matlock Bank & Trust Company), Appellant,**

v.

**Zula FRANCIS, Appellee.**

Court of Appeals of Kentucky.

June 3, 1955.

Charles R. Bell, Joe B. Orr, G. D. Milliken, Bowling Green, for appellant.

Paul R. Huddleston, Bowling Green, for appellee.

STANLEY, Commissioner.

Millsop Sears Francis, who was commonly called "Doc", died on July 29, 1952, possessed of an estate of $207,000. His widow, Zula Francis, upon rejection of a claim by the executor of her late husband's will, instituted this suit to recover $60,000 on an express contract or mutual understanding that she should be paid that sum as compensation for services and money which she put into his business. The decedent's check for that amount, executed and delivered to her four days before his death, was filed in support of her claim. Judgment was awarded the plaintiff for the sum asked and the executor appeals.

The case has been resolved into one of fact or of sufficiency of the evidence to sustain the judgment. By concession, the usual conflicting claims of applicable law are not here to trouble us or becloud the real issue in the case. That which was not conceded on submission to the trial court was disposed of in the chancellor's able opinion, and his rulings on the law are not here questioned.

A heavy record of depositions was built up. Much of it, as the trial court found, was incompetent or irrelevant or of little

weight. The court excluded from his consideration opinions, hearsay and the decedent's self-serving declarations and all of Mrs. Francis' testimony. After separating the "wheat" from the "chaff", the court regarded the "wheat" as proving not only the substantial contribution of Mrs. Francis' own funds to her husband's junk and salvage business but of managerial services and labor greatly exceeding anything that could be presumptively gratuitous or such as could be regarded as a duty ordinarily imposed by the marital status. There was a commercial relationship. The court regarded the evidence as establishing an express contract through a mutual understanding and a legal obligation on the decedent's part to pay his wife for her contributions, work and labor, and that such was the consideration for the check of $60,000. The court's opinion extensively and critically examined the competent evidence. A lengthy repetition here would be of little avail, but a brief reference seems necessary.

When a young man, "Doc" Francis, through speculation, lost the estate which he had inherited and took the bankruptcy law. Thereafter he traded and conducted all his business transactions in the name of his unmarried sister, Mamie Francis. Until the end, he bought and sold property in her name and in that name carried on all his business of every kind, including his bank accounts. It appears that he, his sister, brother, mother and his wife lived together. Concerning his manner of doing business in his sister's name, Judge Rodes observed: "It is idle now to speculate as to why he did so, whether because of some unsatisfied judgment possibly kept alive or with the idea of circumventing his wife's potential dower or because he found in his sister Mamie a submissive medium in his trading. I am inclined to take the last mentioned view."

The appellee was teaching school when she married "Doc" Francis in 1926. He had been married twice before and had a daughter by a former wife, but he was not certain even of her whereabouts, as revealed in his will. Mrs. Francis continued to teach until, as the court found, she and "Doc" entered the junk business in a small way. Her savings and earnings furnished the capital at the start of the venture, which began as a small one. During the sixteen years following, until disposed of in 1944, the business prospered and made money, even in the depression years. Mrs. Francis then went back to teaching and her husband began trading in real estate (in the name of Mamie Francis) using the proceeds of the former business as capital. The nature and characteristics of the deceased, as well as of his wife, are of weight. The evidence introduced by the executor is to the effect that he was "slick and shrewd" and, indeed, (as admitted by the witnesses) unscrupulous in business transactions and immoral in personal conduct. If this means anything here, it means that he was selfish. His wife was industrious and loyal to him during a period of 26 years.

We accept the following statement of the trial court's opinion as being fully sustained by the record:

"There is a substantial controversy as to the nature and extent of the services performed by the plaintiff at the junk yard over the period of 16 years. The proof is conclusive that the plaintiff was paid nothing for these services which were more than trivial or clerical but were substantial and difficult. The evidence shows that she carried the key to the house and that she first arrived there and opened the door before the hands were to come at seven o'clock in the morning and that she frequently worked until six o'clock P.M. and even eight and nine at times in the evening, and at some infrequent intervals on Sunday. Her work necessitated the receipt of junk, fixing the price and paying for it. Also the sale of junk, fixing the price and collecting the money. And all this required knowledge and skill. Her work required a segregation of the material received and the grading of it and embraced all manner of salvage, including even rags. She has been seen loading this material not

only on trucks but up in box cars attending to the loading and shipment of such material. Now, such services of this character cannot be said to be required by marital duties. They were not personal but were extraordinary and unusual and the Court has no doubt as to the enforcibility of an express agreement, though proven by facts and circumstances, to pay for such services."

It may be added that Francis relied heavily on his wife. Also, that while the widow makes no claim of a partnership, yet it is a significant admission that in a suit relating to a liability under the Wages and Hours Law both Mr. and Mrs. Francis, on May 12, 1944, signed a consent judgment in which it was alleged they were partners doing business under the name and style of "Doc Francis."

In 1949 "Doc" Francis had a leg amputated because of a diabetic condition, and was in a wheel chair for some time before his death. In December, 1950, about 18 months before he died, he summoned a lawyer and had him prepare his will. At that time he and his sister, Mamie, signed a paper reciting that all real estate which he had placed in her name was in fact his own and that she had no personal interest in it. The will devised a house and lot to Francis' daughter by the former marriage and certain property to his wife, Zula, which he valued in his will at $55,000 but which proved to be worth only $37,500. After providing a life income for his sister and brother, he left the estate in remainder for the establishment of a home for old people of Warren County.

Miss Mamie Francis (who, obviously, was testifying against her own interest, as she did extensively as to the kind and degree of work which Mrs. Francis had done in connection with her husband's business) testified that she had heard her brother say "over and over again" while the business was being operated and afterward, "Now, Zula, you will get your money, every penny of it." A lifelong friend, R. E. Jones, testified to Mrs. Francis' extraordinary work and contribution to the business and of "Doc's" expressions of appreciation of his wife's help and ability. About "a couple of months" before he died, he remarked to this friend that he was going to make a settlement with his wife because "she has earned it." Five or six days before his death, the witness asked "Doc" if he had made such settlement, and he said he had not but intended to do so. Another old friend, Mrs. Mary Payne, testified to the same effect, particularly that within a month of his death, when she called to see him, he told her he had been thinking of what they had been talking about and "I think I will give Zula hers in a check, but I am going to give Mamie hers in money, in cash."

We further adopt the following from the trial court's opinion: "About the first week in July, 1952, Doc was baptized by a minister of the Gospel. We have no means of knowing the sincerity of his conversion, but within two weeks he signed, on July 25th, 1952, a check on the Citizen's National Bank of Bowling Green, payable to Zula, for $60,000. This check was written by Zula but signed by Doc in the name of Mamie Francis. At that time Doc had in the Citizen's National Bank a small deposit of $2,600. Zula was instructed by Doc to take the check to Jones Mercer, who was President of the Potter-Matlock Bank & Trust Company, nominated as his Executor in his will, and tell him to pay it. The meaning, force and effect of this check is in controversy in this case. Doc died on July 29, 1952, four days after the giving of the check."

The sister, Mamie, described the incidents surrounding the giving of the check, which had occurred in her presence. She testified, "He told her that was concerning the settlement when he gave her the $60,000" and further directed her what to do with it. Mrs. Francis put the check away and did not take it to Mr. Mercer until after her husband's death.

■■ The trial court thus regarded the giving of the check; "Now, what is the meaning, force and effect of the check for $60,000.00 signed and delivered on July

25th, 1952? It is conceded that it can have no effect as a gift inter vivos or causa mortis. It is conceded by the parties to have some effect. A written instrument signed by a party imports a consideration. Greenup v. Wilhoite, 212 Ky. 465, 279 S.W. 665, where it was written: 'There is a well established rule that every writing evidencing an indebtedness imports a consideration under our statutes.' While no good as a bank check, it may be evidence of an acknowledgment of a previous legal liability and the equivalent of a promise to pay. Pikeville National Bank & Trust Co. v. Shirley, 281 Ky. 158, 135 S.W.2d 431, where it was written: 'An ordinary check is generally considered by courts as merely a promise to pay.' I look upon this check as an acknowledgement of a previous legal liability, a ratification of previous oral promises and as a written promise to render just compensation to the plaintiff, determining between the parties the amount of it."

We need to add but little to this. We may, however, note as of particular application Foxworthy v. Adams, 136 Ky. 403, 124 S. W. 381, 27 L.R.A.,N.S., 308, Ann.Cas.1912A, 327. In that case an elderly gentleman, about four months before he died, made out checks for $500 payable to his wife and to his physician, Dr. Charles McClure, and gave them to a friend to be delivered to the payees after his death. But the next day the wife's check was given to her in person by her husband. The court held that the checks could not be regarded as gifts because delivery of the subject matter was incomplete, and whether the sums were collectible from the estate depended on whether there was an obligation on the part of the decedent to pay the sums the checks represented. It was held that there was no legal obligation to the wife but there was such an obligation to Dr. McClure for past and future professional services. See also of like effect Griffin v. Louisville Trust Co., 312 Ky. 145, 226 S.W.2d 786. In the present case, Francis' direction to his wife to present the check to the Trust Company, which he had named as his executor, is the equivalent of the written memorandum executed by Foxworthy.

It is the general conception that a check is presumed to have been in payment of a debt or for money given rather than as a gift or loan unless the circumstances indicate otherwise. Hiscock v. Hiscock, 257 Mich. 16, 240 N.W. 50, 78 A.L.R. 953. The circumstances in this case sustain the presumption of a purpose to pay a recognized obligation rather than otherwise.

We have not overlooked the evidence relied upon by the executor which tends to refute the claim. But considering all the proof, we have had no trouble in concurring in the finding of the trial court.

Judgment affirmed.

SIMS, J., not sitting.